FILED
Superior Court Of California,
Sacramento
12/21/2022
erubiodelrio
By _____, Deputy
Case Number:
34-2022-00331717

Steven Sklaver (SBN 237612)
Michael Gervais (SBN 330731)
Rohit Nath (SBN 316062)
Susman Godfrey L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com
rnath@susmangodfrey.com
*Attorneys for Plaintiffs*
[Additional Counsel listed in Signature Page]

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| THE CITY OF SACRAMENTO and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the City of Sacramento City Attorney Susana Alcala Wood,<br><br>Plaintiffs,<br><br>vs.<br><br>MCKINSEY AND COMPANY, INC., MCKINSEY & COMPANY, INC. UNITED STATES, and MCKINSEY & COMPANY, INC. WASHINGTON D.C.,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**CIVIL ACTION**<br><br>**AMOUNT DEMANDED EXCEEDS $10,000**<br><br>**(1) PUBLIC NUISANCE (CAL. CIV. CODE §§ 3479-80)**<br><br>**(2) COMMON LAW NEGLIGENCE**<br><br>**(3) VIOLATION OF THE FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 ET SEQ.)**<br><br>**(4) COMMON LAW FRAUD AND MISREPRESENTATION**<br><br>**(5) VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)** |

BY FAX

The City of Sacramento and the People of the State of California (hereinafter "Sacramento" and "California"), by City Attorney Susana Alcala Wood alleges as follows:

There is an immediate hazard to public health and safety in Sacramento and California generally arising out of the opioid epidemic. McKinsey and Company, Inc. (hereinafter "McKinsey")—who devised and implemented sales strategies that dramatically increased the distribution of OxyContin and other opioids—bears significant responsibility for the epidemic of addiction and addiction-related deaths that have devastated much of the country. Cities and towns throughout the United States now confront a full-scale public health crisis. Sacramento is no exception.

Sacramento now seeks to hold McKinsey responsible for its roles in the epidemic, including by demanding contribution to the expensive solutions necessary to abate the ongoing public health crisis. Sacramento pursues these remedies in its governmental capacity for the benefit of the general public.

## I.    PRELIMINARY STATEMENT

1.    Before the mid-to-late-1990s, opioid painkillers were generally prescribed for short-term use—for example, to treat acute pain following surgery or caused by cancer treatment—or to treat severe pain during end-of-life care. Restricting prescription opioid use to those relatively narrow classes of patients reflected the medical profession's well-founded concern about the dangerousness of opioids. Prescription opioids are either derived naturally or produced through chemical synthesis to possess properties similar to opium and heroin. Like heroin, prescription opioids dull the perception of pain by acting on opioid receptors in the brain and spinal cord. Because they can produce a euphoric high, prescription opioids are highly addictive, and because they cause respiratory depression at higher doses, they can be very dangerous, even fatal, to the user's health. For those reasons, prescription opioids are strenuously regulated by the Federal Drug Administration ("FDA") as Schedule II Controlled Substances: drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2).

2.      Prescription opioids include both brand name drugs such as OxyContin and Percocet and generic drugs such as oxycodone (the active ingredient in OxyContin) and hydrocodone. Generic prescription opioids are often made by more than one manufacturer.[1]

3.      When patients use prescription opioids continuously over time, they develop analgesic[2] tolerance—in other words, their nervous systems no longer react the same way to the drug and they require higher doses to achieve the same numbing effect.   Moreover, prescription opioid use lasting more than a few weeks results in physical dependence, meaning that if the patient stops or delays use of the drug, they will experience symptoms of physical withdrawal.  Withdrawal symptoms can include severe anxiety, headaches and muscle pain, increased heart rate, sweating, chills, nausea, and vomiting.

4.      The combination of these characteristics makes long-term prescription opioid use fraught with serious risks of withdrawal, addiction, and overdose.  Thus, until the late 1990s, prescription opioid painkillers remained largely limited to short-term use (to treat severe pain following surgery or during chemotherapy) and end-of-life care (when the consequences of tolerance and physical dependence are less significant).  Long-term use of opioids to treat chronic pain—meaning non-cancer pain lasting more than three months—remained rare.

5.      Beginning in the mid to late 1990s, those prescribing patterns began to change. Realizing that they could make more money if they sold more pills to more patients, Purdue and other opioid manufacturers developed and pursued a sophisticated and long-running campaign to expand the market for their addictive drugs.  The goal of the campaign was simple:  convince prescribers and patients that pain—and chronic pain in particular—was being routinely ignored and undertreated, and that long-term use of prescription opioids was the safe and effective solution.

---

[1] For example, oxycodone is manufactured by Purdue Pharma (in the form of OxyContin) and in its generic form by Actavis, Endo, and Teva.

[2] "Analgesia" refers to relief from pain.  Painkillers are often referred to alternatively as analgesics.

6.     The opioid manufacturers' campaign was a massive success.  Prescribers began writing more prescriptions, for more conditions, for more days per prescription, and at higher doses. By 2007, prescription opioid sales had more than tripled in just seven years, and there had been a sea change in prescribing: Drugs that were once seen as a last resort or temporary necessity came to be viewed as commonplace long-term treatment options.

7.     In fact, no reliable clinical trial has ever been conducted to examine the safety and efficacy of using prescription opioids for more than twelve weeks to treat chronic pain.  Both the FDA and the Centers for Disease Control (CDC) have recognized opioid manufacturers' false and misleading representations about the relative risks and benefits of long-term opioid use,[3]   and indeed, many of the claims made in the course of their campaign to expand the market for opioid painkillers were directly contradicted by required FDA-approved labeling.  Opioid manufacturers knew the representations made in the course of their campaign to expand the market for their drugs—on a nationwide basis including in Sacramento—were either unsupported or directly contradicted by reliable scientific evidence.

8.     In 2007, Purdue Pharma L.P. ("Purdue") pleaded guilty to misleadingly marketing Oxycontin. On May 10, 2007, John Brownlee, United States Attorney for the Western District of Virginia, announced the guilty plea and stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to Oxycontin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

---

[3] *See* Letter to Dr. Andrew Kolodny from Dr. Janet Woodcock dated September 10, 2013, *available at*                                    http://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf ("Dr.  Woodcock Letter"); *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016,* Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

9.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Health and Human Services ("HHS"). For a period of five years, ending in 2012, Purdue was obligated to retain an independent monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

10.     The Corporate Integrity Agreement imposed constraints on Purdue's sales and marketing practices. This was a problem to solve: Purdue and its controlling owners, the Sackler family, did not intend to let the Corporate Integrity Agreement stand in their way. They still intended to maximize sales of OxyContin.

11.     OxyContin's sales in the short term were especially important to the Sacklers. After Purdue's 2007 guilty plea, the Sacklers considered options to distance the family from Purdue. One option was to sell the company or merge it with another pharmaceutical manufacturer. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

12.     Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

13.     In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue—which had by then become the subject of substantial public scrutiny—appear as an attractive acquisition target or merger partner to another pharmaceutical manufacturer, or as a creditworthy borrower to a lender.

14.     In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company for good.

15.     Given the complexity of the problem, the Sacklers and Purdue realized they would need assistance in achieving these internally contradictory objectives. Purdue did not have the

capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. To solve their problem, they turned to the elite global consulting firm McKinsey, which had already been advising the Sacklers and Purdue since at least 2004.

16.    By June 2009, McKinsey and Purdue were working together to increase sales of Purdue's opioids. McKinsey suggested a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey and Purdue then implemented McKinsey's plan. Despite the strictures imposed on Purdue by the Corporate Integrity Agreement, OxyContin's sales multiplied.

17.    McKinsey devised ways to counter "emotional messages from mothers with teenagers that overdosed [o]n OxyContin," including by relying on emotional slogans favorable to Purdue and be relying on misinformation.

18.    McKinsey also urged Purdue to capitalize on OxyContin's extended-release characteristics. McKinsey suggested marketing OxyContin as requiring fewer pills, based on the representation that OxyContin's 12-hour dosing meant that users only needed to take OxyContin twice a day. But OxyContin was known to wear off after 8 to 10 hours for many patients. The marketing tactic perpetuated a vicious cycle that became, in the words of one neuropharmacologist, "the perfect recipe for addiction."[4]

19.    For years, McKinsey advised Purdue on implementing various strategies to increase sales of OxyContin. With McKinsey's guidance and participation, Purdue deceptively represented to physicians that OxyContin would improve patients' function and quality of life. McKinsey also urged Purdue to maximize its sales of OxyContin by increasing the time that its sales representatives spent in the field pushing opioids, requiring those representatives to target the prescribers who could be persuaded to write the most scripts for OxyContin, and prioritize OxyContin in Purdue's incentive compensation targets.

---

[4] Harriet Ryan et al., *'You Want a Description of Hell?': OxyContin's 12-Hour Problem*, L.A. Times (May 5, 2016), http://www.latimes.com/projects/oxycontin-part1.

20.   In 2012, Purdue's Corporate Integrity Agreement expired. With its demise, McKinsey's ongoing relationship with Purdue flourished.

21.   At the same time, Purdue was concerned that sales of OxyContin might decline as Purdue's patent expired and Purdue no longer had exclusivity over OxyContin's original formulation.

22.   In 2013, McKinsey proposed, and Purdue implemented with McKinsey's ongoing assistance, an expanded marketing initiative aptly named *Project Turbocharge*. Recognizing that the initiative's name might draw attention, McKinsey and Purdue renamed it "Evolve to Excellence," or "E2E." Although the name was less transparent, the substance was the same. McKinsey advised Purdue that it would see a greater return on its investment if it were to target specific, high-value prescribers—including by aggressively marketing OxyContin to doctors whose prescribing practices suggested their prescriptions flowed to uses that were not medically appropriate. McKinsey's Project Turbocharge was intended to increase sales that would ultimately expand an illicit market.

23.   Purdue had a legal obligation not to target these prescribers, and indeed was required to report these prescribers' conduct to law enforcement. Purdue later entered into a second plea agreement for, among other things, failing to report and provide complete information to the U.S. Drug Enforcement Administration ("DEA") regarding prescribers that Purdue's internal anti-diversion programs indicated should not have been targeted.

24.   Despite significant headwinds, OxyContin sales peaked in 2013. The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales: The guilty plea identified a specific segment of existing OxyContin sales that were illegitimate and should thus cease. All else being equal, OxyContin sales should have decreased to account for the successful snuffing out of improper sales. In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

25.   Within five years, however, OxyContin sales *tripled*. And McKinsey is responsible for the strategy the caused this. It presented specific plans to Purdue that Purdue adopted and spent

hundreds of millions of dollars implementing. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[5]

26.     McKinsey has recently been the subject of scrutiny for its various business practices. On March 7, 2019, Kevin Sneader, McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated: "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair—will continue. It is the price we pay for being 'in the arena' and working on what matters."[6]

27.     Weeks later, McKinsey announced that it would no longer work for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders to combat the crisis," McKinsey stated.[7]

28.     The price for being in the arena is more than scrutiny. Like everyone else, McKinsey is responsible for its actions. McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue pleaded guilty for misbranding the drug in 2007. Indeed, McKinsey's mandate was to increase the sales of OxyContin *in light of* Purdue's guilty plea.

29.     McKinsey set out to increase the sales of OxyContin given the strictures imposed by the Corporate Integrity Agreement. And that it did, "turbocharging" the sales of a drug it knew full well to be addictive and deadly. McKinsey's efforts tripled OxyContin sales.

---

[5] On February 10, 2018, Purdue announced that it is no longer marketing opioids and disbanded its OxyContin sales force.

[6] *See "The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Magazine (Mar. 8, 2019), https://www.fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader.

[7] *See* Paul La Monica, *Consulting Firm McKinsey No Longer Consulting for Purdue, Ends Opioid Work*, Bloomberg (May 23, 2019), https://www.bloomberg.com/news/articles/2019-05-24/mckinsey-no-longer-working-with-purdue-halts-opioid-consulting.

30.     As reported in the media, in a series of agreements, McKinsey recently settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

31.     Because of McKinsey's conduct, Sacramento now suffers a severe public health crisis. The costs of the opioid epidemic has been overwhelming for California and Sacramento.

32.     In the decade between 2008 and 2017, over 14,500 Californians died due to prescription opioid drug overdoses,[8] including 1,882 deaths in 2017.  On average, about six Californians die each day from an opioid-related overdose.[9]  There were over 80,000 emergency room visits and hospitalizations in California from opioid overdoses during that same time period.[10]

33.     In Sacramento County, from 2008 to 2015, a total of 8,530,963 opioid prescriptions were prescribed to 1,227,602 patients.  That rate of over-prescription led to greater rates of addiction and vastly greater rates of death.  In 2017 alone, there were 61 opioid-related deaths in Sacramento County—roughly 5 per month.  By 2021, there were roughly 14 opioid-related deaths per month.

34.     Those numbers cannot convey the extent of the harm suffered by Sacramento, California, and its citizens.  Sacramento is a city of vibrant neighborhoods.  It has a rich history and diverse culture.  Yet the flood of opioids into Sacramento has disrupted the lives of its citizens, damaged its communities, and imposed overwhelming financial and logistical costs on its government.

35.     Those costs are borne especially by Sacramento's homeless and senior citizens. Individuals with opioid use disorders not only face the risk of overdose and death, but may also struggle to hold jobs, maintain homes, and be stable parents.  They are likely to suffer additional health problems and may turn to crime to finance their addictions.  The homeless population are therefore some of the worst victims of the opioid crisis.  Since the crisis began, the number of

---

[8] California Department of Public Health, *California Opioid Overdose Surveillance Dashboard*, at https://skylab.cdph.ca.gov/ODdash.

[9] *Id.*

[10] *Id.*

homeless Sacramento has doubled and is expected to continue to grow due to increased opioid addiction.  Compounding the issue is the fact that, like many cities, Sacramento was unprepared for the opioid crisis.  The newly homeless have placed a tremendous burden on the City's shelters. There are far more homeless residents than beds available to them.  Those who cannot find a bed to sleep in are forced to sleep in public areas outside, and have built encampments in order to survive.  Those encampments, while necessary in some instances for the survival of the homeless on a cold night, present innumerable public health risks for Sacramento residents.  Human waste is not properly disposed of, fires used to keep the homeless warm often lead to greater more hazardous conflagrations, and—because of increased and persistent drug use among the homeless, including heroin that is primarily injected—syringes litter the City's parks.

36.     Sacramento is making every effort to assist the opiate-dependent homeless, alongside the homeless population in general.  That has meant millions upon millions of dollars in outlays for shelters, prevention and treatment, pathways to housing, and other related services for a population of roughly 5,000.  But the City fears, rightly, that its increasing efforts are not enough. Homelessness is difficult enough to "solve" without the introduction of opioid addiction.  This epidemic has only made developing solutions that much harder for Sacramento.

37.     The effects of the opiate crisis have also been, and continue to be, devastating for Sacramento seniors as well as seniors throughout California.  While opioid use disorder can affect people of all ages, older adults are among the groups affected by this problem because they often use prescription opioids to cope with painful chronic conditions, like arthritis, or procedures, such as surgery.  Indeed, about 40 percent of older adults report pain, compared to 30 percent of the general population.[11] Those challenges can make older adults, like people of all ages, prone to relying on opioids and other substances such as alcohol to ease emotional and physical pain in their daily lives.  The Centers for Disease Control and Prevention's (CDC) analysis of data from the

---

[11] Le Roux, C., Tang, Y. and Drexler, K., 2016.  Alcohol and opioid use disorder in older adults: neglected and treatable illnesses.  Current Psychiatry Reports, 18(9), p.87.

National Health and Nutrition Examination Survey, 2007–2012 found that the rate of opioid analgesic use in the past 30 days was 7.9% for those aged 60 and over, compared to 4.7% for those aged 20–39.[12] More alarming, 35% of patients aged older than 50 years with chronic pain reported misuse of their opioid prescriptions in the past 30 days.[13]

38.    Like anyone else, if older adults use prescription opioids for a long time, they risk developing an opioid use disorder.  But OUD is particularly devastating for seniors.  Opioid use among older adults can result in excessive sedation, respiratory depression, and impairment in vision, attention, and coordination, as well as falls.[14]  According to the National Safety Council, seniors taking opioids are 87% more likely to die, 68% more likely to be hospitalized, and have four times as many bone fractures compared to seniors taking over-the-counter medications.[15]

39.    Sacramento seniors have been particularly affected by McKinsey's misconduct. Nearly 80,000 seniors were given 186,666 opioid prescriptions in 2015 alone.  Over the years, opioid manufacturers, including Purdue, profited handsomely from these prescriptions.  In 2007, for example, someone with an opioid use disorder consuming between 0.5 grams and 1 gram of OxyContin every day for a year would have to spend between $26,280 and $52,560 without insurance—which could be more than the median household income of about $50,000 in 2007 (in 2007 dollars).[16]  To put this in perspective, a person on Medicare would only pay $9.78 per gram,

---

[12] Frenk, S.M., Porter, K.S. and Paulozzi, L., 2015.  Prescription opioid analgesic use among adults: United States, 1999-2012 (No. 2015).  US Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

[13] *Id.*

[14]  SAMHSA (Substance Abuse and Mental Health Services Administration) and AoA (Administration on Aging).  2012.  *Older Americans Mental Health Issue Brief 5: Prescription Medication Misuse and Abuse Among Older Adults.*

[15]  https://www.nsc.org/in-the-newsroom/opioid-prescription-painkillers-have-hidden-deadly-side-effects https://medshadow.org/medshadow_blog/why-opioids-are-more-dangerous-for-seniors/

[16] White House Council of Economic Advisors, The Role of Opioid Prices in the Evolving Opioid Crisis, April 2019, p. 7.

or between $1,785 and $3,570 per year (in 2007 dollars), to fund an opioid addiction in the same year.[17]   Nationally, the number of potency-adjusted opioids per capita subsidized by Medicare increased by 2,400 percent between 2001 and 2010.   And in a 2016 study in JAMA Internal Medicine, the study found that Medicare beneficiaries were being prescribed a disproportionate amount of opioid medications after hospital stays.   Specifically, researchers reviewed hospitalizations for approximately 623,000 Medicare beneficiaries in 2011.   These beneficiaries were not previously on opioid medications, at least not for the 60 days preceding their hospital stay.   Nearly 15% of them filled a new opioid prescription within one week of hospital discharge and 42.5% of them continued on those medications for longer than 90 days.[18]   The People of California paid for a substantial portion of these Medicare-subsidized prescriptions for  Sacramento seniors, and Sacramento suffered the ultimate effects of this over-prescription.

40.     The opioid epidemic therefore permeates all aspects of life in Sacramento and threatens the physical and financial health and future of Sacramento and all of California.

41.     Sacramento brings this action to recover damages from McKinsey and to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup costs it incurred or will incur because of McKinsey's conduct. McKinsey knew of the dangers of opioids and nonetheless encouraged Purdue to improperly market and sell OxyContin.

**II.     PARTIES**

**A.  Plaintiff**

42.     Plaintiffs are Sacramento, a municipal corporation organized and existing under the laws of the State of California, and the People of the State of California.  Plaintiffs, acting by and through the Sacramento City Attorney, are authorized to bring the causes of actions asserted herein,

---

[17] *Id.*

[18] https://www.verywellmind.com/opioid-epidemic-and-medicare-part-d-4101218

1   including under California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, et

2   seq.[19]

3         43.     Plaintiffs are responsible for the public health, safety, and welfare of their citizens.

4         44.     The marketing, distribution, and diversion of opioids into Sacramento foreseeably

5   created the opioid crisis and public nuisance for which Plaintiffs seek relief.

6         45.     McKinsey's conduct has exacted a financial burden for which Plaintiffs seek relief.

7         46.     Plaintiffs also seek the means to abate the epidemic caused by McKinsey's wrongful

8   and/or unlawful conduct.

9                              **B. Defendant**

10         47.     Defendant McKinsey and Company, Inc. is a corporation organized under the laws

11   of the State of New York, whose principal place of business is located at 711 Third Avenue, New

12   York, NY 10017, and at all times relevant hereto was authorized to do business and was doing

13   business in California.

14         48.     Defendant McKinsey & Company, Inc. United States is a corporation organized

15   under the laws of the State of Delaware, whose principal place of business is located at 55 E 52nd

16   Street, New York, NY, and at all times relevant hereto was authorized to do business and was doing

17   business in California.

18         49.     Defendant McKinsey & Company, Inc. Washington D.C. is a corporation organized

19   under the laws of the State of Delaware, whose principal place of business is located at 1200 19th

20   Street, NW, Suite 1100, Washington DC 20036, and at all times relevant hereto was authorized to

21   do business and was doing business in California.

22         50.     McKinsey & Company, Inc.; McKinsey & Company, Inc. United States; and

23   McKinsey & Company Inc. Washington D.C. are collectively referred to as "McKinsey."

24

25   _____

26   [19] *See also* Cal. Code Civ. Proc. § 731 ("A civil action may be brought in the name of the people of
     the State of California to abate a public nuisance . . . by the city attorney of any town or city in
27   which the nuisance exists.").

28

51.     McKinsey is a worldwide management consultant company. From approximately 2004 to 2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize the sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

### III.     JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction by grant of authority under the Constitution of the State of California.  This Court has subject matter jurisdiction over the People's claims and the City of Sacramento's claims for restitution, including disgorgement of profits, civil penalties, trebling of relief, injunctive relief, and other equitable relief under California False Advertising Law (Bus. & Prof. Code § 17500, *et seq.*); California Civil Code section 3345; and over the People's claim for abatement under the California Public Nuisance law (Cal. Civ. Code §§ 3479, 3480).

53.     This Court has personal jurisdiction over McKinsey under Cal. Code of Civil Procedure § 410, the California long-arm statute.  McKinsey purposefully availed itself of the benefits, profits, and privileges deriving from their business activities in California and Sacramento. McKinsey has engaged in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantial and intended effect in, the State of California, including in Sacramento.  McKinsey purposefully directed its activities at California and Sacramento, and the claims arise out of those activities.

54.     McKinsey has generated substantial sums from its work promoting OxyContin and other opioids, including in California and Sacramento.  McKinsey assisted Purdue in the wrongful promotion of opioids in Sacramento, through conduct within California and Sacramento and through other business activities directed into California and Sacramento.

55.     Venue in this Court is proper in this judicial district, pursuant to California Code of Civil Procedure §§ 395 and 395.5.

## IV.    FACTUAL ALLEGATIONS

### A.    The Science of Pain Medicine

#### 1.    Prescribers Need Accurate Information Regarding the Risks and Benefits of Prescription Opioids in Order to Treat Pain Safely and Effectively.

56.    The safe and effective treatment of chronic pain—pain lasting more than three months—requires that prescribers be able to accurately weigh the relative risks associated with prescribing opioid painkillers against the benefits likely to result from treatment with opioids and to compare those risks and benefits against the risks and benefits of alternative courses of treatment.

57.    In the context of prescription opioids, it is vital that prescribers and customers receive full disclosure of accurate information regarding risks and benefits, especially when used long-term to treat chronic pain, because of the risks of physical and psychological dependence.

58.    The FDA approves and mandates drug labels on prescription opioids.  Although those labels offer essential information to prescribers regarding, for example, potential adverse reactions and dangerous drug interactions, they do not and cannot inform the prescriber how to weigh the risks and benefits of a particular course of treatment.  FDA labels do not contain dosing caps to limit the total amount of a drug that can safely be prescribed, nor do they identify durational limits beyond which continued use of a drug may result in greater risks to a patient.  Prescribers therefore rely more heavily on materials not produced or reviewed by the FDA—including professional educational materials, such as treatment guidelines and continuing medical education programs ("CMEs"), and scientific and patient-oriented publications and websites—to inform their treatment decisions.

#### 2.    Prescription Opioids are Dangerous and Potentially Deadly.

59.    Opioids—both prescription and illicit—relieve pain by interfering with receptors in the brain and spinal cord.  They also cause physical dependence and, at high doses, result in respiratory depression and death.

60.    Governments—federal, state, and local—have consistently prioritized policies to reduce and minimize addiction.  Opioids have been regulated as controlled substances by the DEA

since 1970.   The FDA-required labeling on scheduled opioid painkillers include "black box" warnings regarding potential addiction and "[s]erious, life-threatening, or fatal respiratory depression" resulting from excessive doses.

61.     Opioids trigger the release of dopamine, which causes feelings of euphoria by stimulating parts of the brain that control pleasure.   A patient using prescription opioids continuously for more than a few weeks will experience tolerance, meaning that higher doses of the drug will be required to achieve the same painkilling effect—and physical dependence, meaning that delay or discontinuance of the opioid will cause symptoms of withdrawal.   Withdrawal symptoms can include severe anxiety, insomnia, hallucinations, headaches and muscle pain, increased heart rate, sweating, chills, nausea, vomiting, and more.   The higher a patient's tolerance—in other words, the higher the dose of opioids—the more severe the symptoms of withdrawal will be in the event of delay or discontinued use.   Symptoms may persist for months after complete withdrawal from opioids.

62.     Unsurprisingly, a patient who is physically dependent on prescription opioids will attempt to avoid the effects of withdrawal.   The euphoric effect of opioid use combined with the unpleasant symptoms of discontinuing use can drive patients to seek further opioid treatment—even if continued use is ineffective at treating pain or interferes with the patient's quality of life. Continuous opioid use over just a few weeks can alter the brain's reward system, as well as other systems in the brain—which drive judgment, planning, and organization—pushing patients to engage in opioid-seeking behavior even when that behavior is irrational or detrimental to the patient's health.   Although dependence and addiction are distinct—dependence refers to physical dependence on a drug and is characterized by withdrawal in the event of discontinued use, whereas addiction generally refers to dependence characterized by continued or compulsive use of a drug in spite of negative physical, mental, or social consequences—in practice the two are inextricably linked.   The combination of physical dependence and addiction is a medical condition often referred to as "opioid use disorder."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

63.     Drug-seeking behaviors can occur when opioids become unavailable, or when the patient has become tolerant such that the dosage is no longer effective, or when doses are tapered too quickly.  Thus, all patients who continuously use prescription opioids are at risk of dependence and addiction—not just patients who "misuse" the drugs.  In short, "correct use and abuse of [prescription opioids] are not polar opposites—they are complex, inter-related phenomena."[20]

64.     Similarly, the risk of overdose and death is present even for patients who take opioids exactly as prescribed.  Patients taking opioids on a long-term basis will develop a tolerance to the painkilling effects of the drug and require higher and higher doses to achieve the same effect.  But scholars suggest that tolerance to the respiratory depressive effects of prescription opioids develop at a slower rate, meaning that the dose necessary to achieve effective pain relief may also kill the patient.  Indeed, patients receiving high doses of opioids are between three and nine times more likely to overdose than those taking low doses.  The FDA has acknowledged that available data suggest a relationship between increasing doses—a common pattern in the context of prescribing opioids for long-term use—and the risk of adverse events including addiction and overdose.

65.     Studies have shown that between 30 and 40 percent of individuals who use prescription opioids on a long-term basis will develop an opioid use disorder.[21]  One of those studies concluded that the lifetime prevalence of physical opioid dependence was nearly identical—within one percentage point—to the lifetime prevalence of an opioid use disorder.

---

[20] Wilson M. Compton & Nora D. Volkow, Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies, 81(2) Drug & Alcohol Dependence 103, 106 (2006).

[21] Joseph A. Boscarino et al., Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system, 105 Addiction 10, 1776-82 (October 2010); Joseph A. Boscarino et al., Prevalence of prescription opioid-use disorder among chronic pain patients: comparison of the DSM-5 vs. DSM-4 diagnostic criteria, 30 J. Addict Dis. 3, 195-94 (July 2011).

66.     The FDA-approved labels for prescription opiates disclose the risks of dependence, tolerance, addiction, and overdose.   Before opioid manufacturers' comprehensive deceptive marketing campaign—which misrepresented or ignored those risks entirely—the medical community recognized the significant dangers associated with long-term use of opioids and therefore generally considered such treatment as a last resort.

67.     Prescription opioids include long-acting drugs taken once or twice daily which are purported generally to provide continuous opioid therapy for twelve hours.   Long-acting opioids are generally also "extended release" (ER) drugs, meaning that the drug is delivered over a sustained period of time.   There are also short-acting formulations, which release immediately to provide 4-6 hours of treatment to address "episodic" or "breakthrough" pain.   Part of the opioid manufacturers' marketing campaign included promoting the use of short-acting opioids to be layered on top of and in conjunction with a continuous course of long-acting opioids.

68.     Both kinds of opioids are extremely addictive.   The FDA has therefore required all extended release, long-acting opioids and all TIRF drugs  to adopt Risk Evaluation and Mitigation Strategies ("REMS") to address "the risks of serious adverse outcomes including addiction, unintentional overdose, and death,"[22] and all labels of Schedule II long-acting opioids warn that the drug "exposes users to risk of addiction, abuse, and misuses, which can lead to overdose and death."[23]   In 2013, the FDA recognized—based on already-available scientific evidence—that "[e]ven proper use of opioids under medical supervision can result in life-threatening respiratory depression, coma, and death."   The FDA therefore required manufacturers of long-acting opioids to clearly communicate these risks on the drugs' labels and in promotional materials distributed by or on behalf of the manufacturers.   Those warnings reflected the same view that had been accepted

[22] *Introduction for the FDA Blueprint for Prescriber Education for Extended-Release and Long-Acting Opioid Analgesics*, updated May 5, 2017, *available at* https://www.fda.gov/downloads/Drugs/DrugSafety/InformationbyDrugClass/UCM515636.pdf.

[23] Dr. Woodcock Letter, *supra*, at 2.

practice in the treatment of pain prior to opioid manufacturers' deceptive campaigns: that all opioid use involves the risks of "addiction, unintentional overdose, and death," and that because of those serious risks, continued use of long-acting opioids should be limited to instances in which "*alternative treatments are inadequate.*"[24]

69.     Nonetheless, FDA programs designed to prevent the prescription of opioids for inappropriate medical uses did not always work effectively.  The TIRF REMS program, for instance, was designed to ensure that TIRF products were only used for breakthrough cancer pain in patients that were opioid tolerant.  The program did not accomplish this goal.  In December 2013, for example, a survey conducted through the TIRF REMS program found that "39.4% of responding prescribers reported prescribing TIRFs for chronic non-cancer pain,"[25] even though the FDA approved TIRF products only for breakthrough cancer pain.  53% of responding pharmacists said either that "TIRFs could appropriately be used for this indication (42.0%), or that they did not know (11.0%)."[26]  In February 2017, "nearly one in five responding prescribers (18.4%) and nearly one in two responding patients (47.7%) erroneously reported that TIRFs were actually FDA-approved for chronic, non-cancer pain."[27]  The TIRF REMS program therefore did not accomplish its goal of ensuring that prescribers only prescribed TIRF products for breakthrough cancer pain in patients that were opioid tolerant.

70.     Although opioid manufacturers learned through the TIRF REMS program and their participation in the TIRF REMS Industry Group that prescribers were prescribing TIRF products

---

[24] Dr. Woodcock Letter, *supra*, at 7 (emphasis added).

[25] G. Caleb Alexander & Joshua M. Sharfstein, Testimony for the Record Submitted to the U.S. Food and Drug Administration, Docket No. FDA-2018-N-1917, at 2 (Aug. 3, 2018), *available at* https://int.nyt.com/data/                    documenthelper/123-fda-opioid-overdose-cancer/4be5694a2729eb5b522d/optimized/full.pdf.

[26] *Id.* at 2-3.

[27] *Id.* at 3.

for inappropriate uses, opioid manufacturers chose not to take any corrective action—in order to secure their profits.

### 3. Reliable Scientific Evidence Supporting the Safety and Efficacy of Long- Term Opioid Use to Treat Chronic Pain Does Not and Has Never Existed.

71.     There is no reliable scientific support for opioid manufacturers' claims that long-term use of opioids can safely and effectively treat chronic pain.  Opioid manufacturers knew this but persisted in promoting their drugs as safe, appropriate, and effective treatment options for chronic pain and failed to disclose evidence that long-term use of opioids actually makes patients sicker.

72.     No reliable clinical trial has ever been conducted to examine the safety and efficacy of using prescription opioids for more than twelve weeks to treat chronic pain.  Both the FDA and the Centers for Disease Control (CDC) have recognized that fact.[28]  Random, controlled trials have produced evidence for the short-term efficacy of opioids to treat certain kinds of pain, but systematic reviews of studies analyzing the efficacy of long-term use conclude that any evidence of long-term efficacy is poor or otherwise unreliable.  Studies of long-term use of opioids to treat chronic pain have also routinely failed to attempt to assess the likelihood of dependence and addiction.

73.     Available evidence in fact casts doubt on the efficacy of opioids to treat chronic pain.  Part of the reason that reliable data regarding the efficacy of long-term opioid use is so scarce is precisely because many patients in clinical trials treated with opioids on a long-term basis drop out because of ineffective pain relief or unpleasant side effects.  A full third of patients included in a meta-analysis of forty-one trials regarding opioid treatment for chronic pain dropped out before the trials were over.  The same study concluded that, although some studies provided evidence that strong opioids (including oxycodone and morphine) were more effective than non-opioid analgesics

---

[28] See Dr. Woodcock Letter, supra; CDC Opioid-Prescribing Guideline, supra.

at relieving pain, for "functional outcomes"—meaning the patient's recovery in areas such as vocational and social functioning rather than symptom resolution—non-opioid pain relievers were more effective than opioids.[29]  Data regarding the use of opioids by individuals with workers' compensation claims establishes that claims involving opioids—and long-acting opioids in particular—are nearly four times as likely to result in costs of over $100,000 than claims that do not involve opioid use, because individuals who take opioids suffer greater side effects and are slower to return to work.  Most importantly, the analysis found that longer-term use of opioids increased the chances that a patient would still be on work disability one year later even after controlling for the severity of the injury and the patient's self-reported pain score.[30]  Studies assessing the efficacy of long-term opioid use to treat more specific conditions—including migraines, back pain, and osteoarthritis—have each failed to provide support for such use.

74.     A 2008 study in the journal Spine came to similar conclusions.  It found that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[31]  Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[32]

---

[29] Andrea D. Furlan et al., *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Can. Med. Ass'n J. 1589 (2006).

[30] Jeffrey A. White et al., *The Effect of Opioid Use on Workers' Compensation Claim Cost in the State of Michigan*, 54 Journal of Occupational and Environmental Medicine Issue 8, 948-953 (August                2012),                *available                at* http://journals.lww.com/joem/Abstract/2012/08000/The_Effect_of_Opioid_Use_on_Workers Compensation.8.asp x.

[31] Jeffrey Dersh, et al., *Prescription Opioid Dependence is Associated with Poorer Outcomes in Disabling Spinal Disorders*, 33(20) Spine 2219, 2219-27 (Sept. 15, 2008).

[32] GM Franklin, BD Stover, et al., *Early Opioid Prescription and Subsequent Disability Among Workers with Back Injuries: the Disability Risk Identification Study Cohort*, 33 (2) Spine 199, 201-202 (Jan. 15, 2008).

75.     The first randomized clinical trial designed to make head-to-head comparisons between opioids and other kinds of pain medications was recently published on March 6, 2018, in the Journal of the American Medical Association.   The study reported that "[t]here was no significant difference in pain-related function between the 2 groups"—those whose pain was treated with opioids and those whose pain was treated with non-opioids, including acetaminophen and other non-steroidal anti-inflammatory drugs ("NSAIDs") like ibuprofen.   Accordingly, the study concluded:  "Treatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."[33]

76.     In sum, although prescription opioids may effectively treat pain on a short-term basis, long-term use leads to tolerance, physical dependence, higher dosing, and increased risks of addiction and overdose.   No reliable evidence supports the safety or efficacy of continued use of opioids for more than twelve weeks to treat chronic pain.   As a pain specialist noted in an article summarizing and assessing the results of multiple studies, scientific data "confirm a common experience for patients with chronic pain: opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning.   Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[34]

### 4.  Generally Accepted Standards Regarding Prescription of Opioids Prior to Opioid Manufacturers' Deceptive Marketing Campaign

77.     For all of the reasons described above, prior to opioid manufacturers' marketing campaign, the generally accepted view in the medical community was that opioids should be

---

[33] EE Krebs, et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients With Chronic Back Pain or Hip or Knee Osteoarthritis Pain: The SPACE Randomized Clinical Trial*, 319(9) J. Am. Med. Ass'n. 872 (Mar. 6, 2018).

[34] Andrea Rubinstein, *Are we making pain patients worse?*, Sonoma Medicine, *available at* http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making- pain-patients-worse.aspx?pageid=144&tabid=747 (last visited Oct. 10, 2018).

prescribed only on a short-term basis to treat acute pain or for cancer pain or during end-of-life care—in other words, under circumstances in which the risks of tolerance, dependence, and addiction are low or have little significance.

78.     Throughout the 1970s and 1980s prescribers continued to avoid the long-term use of opioids to treat chronic pain.  Scientists around that time observed negative outcomes from such opioid use, including mixed reactions regarding the long-term pain relief and function; inability to take advantage of complementary treatments including physical therapy because of the side effects of opioids; and misuse or addiction.  Even in the context in which the use of opioids was considered appropriate—to treat cancer pain—the generally-accepted view was to prescribe opioids only after exhausting other options.  This generally-accepted view was exemplified by the "analgesic ladder" published by the World Health Organization ("WHO") in 1986.  The ladder recommended that cancer pain first be treated with acetaminophen (Tylenol) or NSAIDs (aspirin, ibuprofen, or naproxen), and then with unscheduled or combination opioids (weak opioids like codeine or tramadol), and only then with stronger opioids (Schedule II or III drugs like morphine and oxycodone) if pain persisted.  The guidelines did not contemplate the use of opioid painkillers for long-term use to treat chronic pain.

79.     In 1994, Dr. Russell Portenoy—who later became Charmain of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center, as well as a primary paid spokesperson for drug manufacturers—described prevailing attitudes toward long-term use of opioids this way:

> The traditional approach to chronic nonmalignant pain does not accept the long- term administration of opioid drugs. . . . Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects.  There

is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.[35]

Opioid manufacturers sought to change those perceptions.

### B. Opioid Manufacturers Spread False and Misleading Statements to Create and Sustain a Market for Their Prescription Opioids

80.     Opioid manufacturers' direct marketing of opioids, meaning the marketing they did through their own sales forces and marketing groups and that were publicly associated with the opioid manufacturers, generally proceeded on two tracks.  First, opioid manufacturers marketed their opioid products to potential patients.  Second, opioid manufacturers marketed their opioid products to prescribers.

81.     Opioid manufacturers, including Purdue, advertised their opioid products to potential patients because they knew that physicians are more likely to prescribe a drug if a patient specifically requests it. In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request.[36] Opioid manufacturers also knew that prescribers' willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[37]

82.     Opioid manufacturers' advertisements to potential patients deceptively portrayed the risks and benefits of using opioids to treat chronic pain. Manufacturers represented to patients that opioids would provide long-term pain relief and functional improvement, that long-term prescriptions of opioids do not cause addiction, and that addiction is rare. Opioid manufacturers also promoted extended-release formulations of their drugs as having been designed to prevent abuse.

---

[35] Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt. 247 (1994).

[36] J.B. McKinlay et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior: Results of a Factorial Experiment*, 52(2) Med. Care 294-99 (April 2014).

[37] *Id.*

83.     Opioid manufacturers also marketed their drugs to prescribers, including by sending sales representatives (called "detailers") to visit prescribers and medical staff in their offices, participating in small-group speaker programs, and publishing written advertisements in medical journals. Opioid manufacturers then tracked physicians' prescribing activity in order to monitor and improve the effectiveness of their efforts.

84.     In August 2016, the U.S. Surgeon General expressed concern that that "heavy marketing to doctors" had led many to be "taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain," and noted the "devastating" results that followed from this misinformation.[38]  A 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told the drugs were potentially addictive.[39]

85.     Opioid manufacturers made deceptive claims to prescribers. Their detailers omitted or minimized serious risks of opioid use, including the risk of misuse, abuse, and diversion to illicit markets. Opioid manufacturers represented that opioids have "no ceiling dose," suggesting that prescribers can safely increase dosage without limit. Manufacturers pushed the concept of "pseudoaddiction," which recast signs of addiction as signs of inadequately treated pain. Manufacturers also claimed that addiction can be avoided through the use of screening tools, like "opioid agreements," which can supposedly ensure that patients take drugs as prescribed. Opioid manufacturers failed to mention that opioid agreements and other screening tools had not been proven to decrease the risks of addiction or make addiction easier to identify or manage.

86.     In these ways and others, opioid manufacturers, including Purdue, marketed their drugs with information that was false, misleading, contrary to credible scientific evidence and their

---

[38] Letter from U.S. Surgeon General Vivek H. Murthy (Aug. 2016), https://perma.cc/VW95-CUYC.

[39] Hazelden Betty Ford Foundation, *Missed Questions, Missed Opportunities*, January 27, 2016, *available at* http://www.hazeldenbettyford.org/about-us/news-media/press-release/2016-doctors-missing-questions-that-could- prevent-opioid-addiction.

own labels, and that lacked balance and substantiation. Marketing materials omitted material information about opioids and overstated their benefits.

### C. Purdue Pleads Guilty to Misbranding OxyContin and Is Bound by a Corporate Integrity Agreement

87.     On May 10, 2007, the Purdue Frederick Company (Purdue's parent), as well as three of Purdue's officers, pleaded guilty to misbranding of OxyContin in violation of various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* In connection with these guilty pleas, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

88.     Purdue also entered into a Corporate Integrity Agreement with the Office of the Inspector General of the United States Department of Health and Human Services (HHS). Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

89.     The Corporate Integrity Agreement required Purdue to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate, … including, but not limited to, information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue' products that are designed to ensure that financial incentives do not inappropriate motivate such individuals to engage in the improper promotion or sales of Purdue's products;

the process by which and standards according to which Purdue's sales representatives provide Materials or respond to requests from HCPs [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products.

90.     The Corporate Integrity Agreement also required Purdue to engage an "Independent Review Organization" to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the Inspector General of HHS.

### D. Purdue Hires McKinsey to Boost Opioid Sales in Light of the Company's Guilty Plea and Corporate Integrity Agreement

91.     The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise Purdue's board of directors was to advise the Sackler family. The interests of the Sackler family, Purdue's board of directors, and Purdue itself are all aligned. As a practical matter, they are indistinguishable.[40]

### 1.  The Sacklers Seek to Divert Money to Themselves

92.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. The Sacklers began to fear that although profitable, the opioid business exposed the family to substantial liability.

93.     One option was to sell Purdue or merge it with another pharmaceutical company. The proceeds of such a transaction could then be re-invested in diversified assets, allowing the Sackler family to distance itself from the opioid business.

94.     Another was to secure loans on Purdue's behalf, in order to ensure that Purdue had adequate funds to continue operating while Purdue made substantial distributions of funds to its owners—the Sacklers. The proceeds of these distributions could also be re-invested in diversified assets, again allowing the Sackler family to distance itself from the opioid business.

95.     In order to pursue either of these options, the Sacklers need to make Purdue an attractive acquisition target or merger partner to another pharmaceutical manufacturer, or as a

---

[40] Craig Landau, soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." In other words, the future CEO of the company understood that the owners, not the CEO, ran the business.

creditworthy borrower to a lender. Maximizing sales of opioids in the short term, even after entering a guilty plea, might help the Sacklers achieve either or both of those goals.

96.    The Sacklers also stepped away from their day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, several members of the Sackler family left their operational roles. But they remained on Purdue's board of directors.

### 2.   Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals

97.    The Sacklers faced a problem: They needed to grow OxyContin sales as dramatically as possible to make Purdue an attractive acquisition target or borrower, while at the same time appearing to comply with the Corporate Integrity Agreement Purdue entered in connection with its 2007 guilty plea.[41]

98.    Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

99.    That is where McKinsey comes in. Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[42]

100.   So it was with Purdue. In May 2009, Purdue's Executive Committee discussed concerns raised by John Stewart, Purdue's CEO, regarding the constraints posed by the Corporate Integrity Agreement. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

---

[41] As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change—the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[42] *How McKinsey Became One of the Most Powerful Companies in the World*, YouTube (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.

101.    In short, Purdue would pay money to McKinsey in exchange for McKinsey's advice regarding strategies to sell as much OxyContin as conceivably possible, and for McKinsey's help carrying out those strategies.

102.    From as early as June 2009 and continuing at least until July 2014, Purdue relied on McKinsey to create and orchestrate its sales and marketing strategy for OxyContin. The two companies had a close relationship. McKinsey's team had ongoing interactions with Purdue, including top executives and directors, regarding not only the creation of an OxyContin sales strategy, but also its implementation.

### E.  What McKinsey Does: "Consulting Is More Than Giving Advice"

103.    Management consulting is the business of providing solutions to clients. These solutions take many forms and depend on the client's needs.

104.    There are basically two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. A strategy consultant would provide a plan to the client that they client may choose to adopt or not.

105.    "Implementation" consulting comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has chosen to adopt the consultant's plan. After a client has taken the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute the plan.

106.    Although McKinsey has been historically regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the suite of services that McKinsey provided to its clients.

107.    Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference

between a McKinsey team member and one of our clients because we're working that cohesively together."[43]

108.    A core component of the relationship between a client and McKinsey is discretion. "The basis of any client relationship with the firm [McKinsey] is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[44]

109.    Broadly speaking, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

110.    McKinsey has long touted the notion of a "transformational relationship." It is the goal of every client relationship McKinsey develops and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

111.    At its core, the "transformational relationship" is long-term. "[O]nce McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[45] As a result, clients come to depend on McKinsey's consultants to operate their business.

112.    Purdue had been developing a "transformational relationship" with Purdue since at least 2004. McKinsey remained steadfast by Purdue and the Sacklers for many years—through he unfolding nationwide opioid crisis, Purdue's 2007 guilty plea, and long after.

---

[43]    McKinsey      on      Implementation,      YouTube      (Apr.      30,      2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

[44] Duff McDonald, *The Firm* 130 (2013).

[45] *Id.* at 6.

### F.  McKinsey Delivers

113.    By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales—notwithstanding the Corporate Integrity Agreement and Purdue's diminishing outlook.

114.    In June 2009, McKinsey advised Purdue senior management, including Craig Landau, who was then Purdue's Chief Medical Officer ("CMO") and would later become its CEO, regarding a variety of strategies to increase Purdue's opioid sales. These strategies were developed using McKinsey's expertise and proprietary approaches to problem solving.

115.    McKinsey prides itself on certain managerial techniques of which it professes to have detailed knowledge and expertise deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

116.    After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers its clients is advice about how to generate growth.

117.    McKinsey takes a "granular" approach to identifying growth opportunities. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on this approach, called *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (2008). "The key," they wrote, "is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[46]

118.    In an article in the McKinsey Quarterly (coincidentally published the same month that Purdue pled guilty), the authors explained:

---

[46] *The Granularity of Growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

> Our research on revenue growth of large companies suggest that executives should 'de-average- their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[47]

119.    McKinsey encouraged a granular assessment not only of products, but also the *geography* of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[48]

120.    McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug. McKinsey's granular analysis of OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

121.    By January 2010, McKinsey informed Purdue that, in accordance with the tenets of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

122.    Then, in June of 2012, Purdue's then-CEO John Stewart assigned McKinsey to "understand the significance of the major factors affecting OxyContin's sales." McKinsey did this in excruciatingly granular detail, analyzing each sales channel of Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. McKinsey also suggested that Purdue establish a direct-mail pharmacy so that the company could circumvent Walgreens entirely and sell directly to its

---

[47] Mehrdad Bahai et al., *The Granularity of Growth*, McKinsey Q. (May 1 , 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[48] *Id.*

customers. McKinsey also suggested distributing "opioid savings cards" in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids notwithstanding Walgreens's actions.

123.    The themes of McKinsey's work would be crystallized in a series of presentations and updated made to the Sackler family and Purdue's board of directors in the summer of 2013, titled "Identifying Granular Growth Opportunities for OxyContin."

### 1.   Marketing – Countering Emotional Messages

124.    McKinsey's opioid work for Purdue was grim from the start. In June of 2009, McKinsey teamed with Purdue's then-CMO Craig Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed [on] OxyContin."

125.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

126.    These marketing claims were specifically designed to skirt the Corporate Integrity Agreement's strictures. While false and misleading, claims regarding "freedom" and "peace of mind" provided by OxyContin were narrowly tailored to avoid representations about "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in the Corporate Integrity Agreement.

127.    Purdue's marketing materials from that time are illustrative of the approach:[49]

---

[49] *State of Tenn. v. Purdue Pharma L.P.*, No. 1-173-18, Complaint at ¶ 24 (Tenn. Cir. Ct. May 15, 2018).



128.    In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to lobby their doctors for OxyContin even when those physicians expressed reservations regarding the administration of Purdue's opioids.

### 2.   Targeting: Selling More OxyContin to Existing High Prescribers

129.    McKinsey's granular approach also identified prescribers who historically had written the most and largest prescriptions, so that Purdue could focus its sales and marketing resources on them.

130.    On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those who had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz, encouraging even more prescribing.

131.    Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

132.    Many of the historically highest prescribers of OxyContin—the same individuals that McKinsey urged Purdue to target—had prescribed OxyContin before Purdue's 2007 guilty plea, and had already been subjected to Purdue's misrepresentations regarding OxyContin.

133.    McKinsey identified those physicians—those who had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin.

134.    McKinsey worked closely with Purdue over many years to continually refine this approach, and required more and more granular data for its analysis. More than three years after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that McKinsey's consultants could further analyze the specific amount of OxyContin that each individual physician prescribed.

135.    At the same time that McKinsey requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to minimize the discretion exercised by Purdue's sales representatives, in order to ensure that Purdue's sales force spent the maximum amount of time with the most attractive customers.

136.    When it unveiled *Project Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no go decision to "Turbocharge the Sales Engine" by devoting substantial capital toward McKinsey's plan.

137.    McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

138.    By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeted the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

### 3.   Titration: Selling Higher Doses of OxyContin

139.   McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, especially for longer periods of use, also contributes to opioid dependency, addiction, and abuse. McKinsey nonetheless advised Purdue to focus on selling higher-strength dosages of OxyContin.

140.   Consistent with its granular growth analysis, as early as October 26, 2010, McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

141.   McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

142.   Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### 4.   Covered Persons: Sales Quotas and Incentive Compensation

143.   McKinsey also urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

144.   Notably, the Corporate Integrity Agreement contemplated exactly this behavior. The Agreement required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products*." (emphasis added).

145.    Notwithstanding the limitations of the Corporate Integrity Agreement, by 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers. The quota was 545,000 visits in 2010, 712,000 visits in 2011, 752,000 visits in 2012, and 744,000 visits in 2013.

146.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

147.    In McKinsey's July 2013 presentation to the Purdue board of directors, McKinsey urged Purdue to increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

148.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days).

149.    McKinsey also urged Purdue to require its sales representatives to make 5% more physical visits to physicians per day.

150.    Additionally, McKinsey advised Purdue on how to craft incentive compensation for sales representatives, who were Covered Persons as defined by the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas, less training, and greater focus on high prescribers, incentive compensation based on the number of OxyContin prescriptions representatives produced could be a powerful driver of incremental OxyContin sales.

### 5.    Increasing the Overall Size of the Market: The Larger the Pie, the Larger the Slice

151.    Consistent with McKinsey's mandate, Purdue incentivized its sales staff to increase not just sales of OxyContin but also generic versions of extended release oxycodone. "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular

medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market.[50]

152.   Typically, one would not wish to encourage sales of generic competitors that offer similar, but often lower-priced, products. But if your goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market can be important.

153.   Notably, the notion that the size of a company's market share is not as important as the size of the overall market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth*, McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[51]

154.   In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[52] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with HHS.[53] McKinsey designed this plan.

155.   Moreover, increasing the size of the opioids market was even better for the Sacklers than it was for Purdue. Just months after Purdue's 2007 guilty plea, the Sacklers established a second company, called Rhodes Pharmaceuticals L.P., which would sell generic versions of opioids.

---

[50] David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[51] *The Granularity of Growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008).

[52] David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[53] *Id.*

### G.  Transformation: Purdue Implements McKinsey's Strategies

156.     As the fall of 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy, which was based on the opportunities its granular growth analysis had identified.

157.     Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

158.     For instance, in January 2010, Purdue was training its sales and marketing force on the new tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. Through this initiative, McKinsey and Purdue would identify the most prolific OxyContin prescribers and then devote significant resources towards convincing them to prescribe even more OxyContin, in higher doses, for longer periods of time, to more patients.

159.     In January 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's physician segmentation" initiative.

160.     This collaboration would continue over the course of the relationship between Purdue and McKinsey.

161.     During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue sales force from Novartis, one of Purdue's rivals. Panara would stay with Purdue until 2013, during which time McKinsey was responsible for increasing OxyContin sales, and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

162.     Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but

that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[54]

163.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time appearing to maintain technical compliance with the Corporate Integrity Agreement. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[55]

## H.  Project Turbocharge

164.    In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates titled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

165.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge" and urged the Sackler family and the Purdue board of directors to adopt it.

166.    The Sackler family endorsed McKinsey's proposals.  And as a result, in the following month Purdue implemented Project Turbocharge. Purdue acknowledged that the name Project Turbocharge carried unsavory connotations, even if it was apt. Purdue therefore re-christened the initiative to something far more opaque: "Evolve to Excellence" or E2E.

167.    Evolve to Excellence (E2E) was the theme of Purdue's 2014 national sales meeting.

---

[54] David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[55] *Id.*

168.     Purdue's then-CEO John Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

169.     After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Russell Gasdia, Purdue's Vice President of Sales and Marketing, in order to implement McKinsey's recommendations.

170.     In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

171.     At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

172.     McKinsey's Project Turbocharge, now re-named E2E, called for a doubling of Purdue's sales budget. Under McKinsey's prior guidance, Purdue's promotional spending had already skyrocketed. But when Purdue adopted E2E, its spending somehow found another gear:



173.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time Project Turbocharge had been implemented, total quarterly sales and marketing at Purdue exceeded $45 million per quarter: an increase of 800%.

### I.   McKinsey's Efforts Triple OxyContin Sales

174.    Purdue got what it wanted out of McKinsey. Between 2008 and 2016, Purdue distributed more than $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

175.    These distributions would not have been possible without McKinsey's work dramatically increasing OxyContin sales.

176.    McKinsey's contributions to Purdue's growth after 2007 were remarkable. OxyContin sales should have naturally declined: The Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a Corporate Integrity Agreement whereby Purdue would be monitored to assure that those sales did not continue.

177.    In 2007, the year of Purdue's guilty plea, the net sales of OxyContin totaled about $1 billion.[56]

178.    But the guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion—tripling annual revenues from sales of OxyContin.[57]

---

[56] David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[57] *Id.*

179.    With McKinsey's help, OxyContin sales reached their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[58] That OxyContin sales peaked in 2013 is especially notable because overall opioid prescriptions had already peaked three years earlier, in 2010.[59] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's long-overdue decision to stop marketing the drug.

180.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

### J.    McKinsey Was Aware of the Devastating Effects of Opioids and Attempted to Maximize Their Sales Anyway

181.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. When McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP, before he left McKinsey in 2008 to lead Valeant Pharmaceuticals.[60]

---

[58] Phil McCausland & Tracy Connor, *OxyContin Maker Purdue to Stop Promoting Opioids In Light of Epidemic*, NBC News (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

[59] Gery P. Guy et al., *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, Morb. Mortal Wkly. Rep. (July 7, 2017), https:www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

[60] John Gapper, *McKinsey's Fingerprints Are All Over Valeant*, Fin. Times (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

182.     Pearson stated, "pharmaceuticals was one of our biggest industry groups."[61] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp-elbowed.'"[62]

183.     Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

184.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals.

185.     In 2012, while advising Purdue, McKinsey described its health care capabilities as vast: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

186.     And by the time McKinsey worked with Purdue on marketing OxyContin in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how

[61] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Inv. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry.

[62] John Gapper, *McKinsey's Fingerprints Are All Over Valeant*, Fin. Times (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

to market its opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were already prescribing large amounts of OxyContin.[63]

187.    In 2002, McKinsey had such intricate knowledge of sales and marketing practices of opioid manufacturers generally, and Purdue's efforts with OxyContin specifically, that it was able to recommend to Purdue's competitor that it boost its own opioid sales by following in Purdue's footsteps.

188.    McKinsey briefed Purdue about ongoing concerns regarding OxyContin's potential for abuse and diversion, including in presentations regarding opportunities to grow sales of OxyContin.

189.    In February 2009, just months before McKinsey's first known opioids-related work for Purdue, Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health titled *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, stated the matter plainly: "Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed." By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."

190.    Dr. Van Zee also identified the very tactics that McKinsey would deploy for Purdue as contributing to misuse and abuse, and suggested that regulation may be appropriate to curtail the strategy: "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some

---

[63] Chris McGreal, *Johnson & Johnson Faces Multibillion Opioids Lawsuit That Could Upend Big Pharma*, The Guardian (June 23, 2019), https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[64]

191.    It bears repeating that at the time that McKinsey advised Purdue, Purdue was bound by a Corporate Integrity Agreement covering Purdue's sales and marketing practices regarding opioids. In other words, McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the overprescribing of opioids and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement—to devise strategies to sell as many pills as conceivably possible. With McKinsey's help, Purdue's growth continued unabated—Corporate Integrity Agreement be damned.

192.    While McKinsey worked to boost sales of OxyContin, Purdue could not even purchase product liability insurance to cover its sales practices.

193.    McKinsey's sales strategies themselves reflected an awareness that pushing OxyContin led to bad outcomes: A key pillar of its early work was to urge Purdue to "counter[] the emotional messages from mothers with teenagers that overdosed on OxyContin."

194.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. The study captures the same time period that Project Turbocharge was implemented. It noted that "physician prescribers are the most frequent source of prescription opioids for individuals who use

---

[64] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 Am. J. Pub. Health 221, 221, 224 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

opioids nonmedically, and it also found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later."[65]

### K.  McKinsey Continued Consulting to Increase the Sale of Opioids Despite the Nationwide Epidemic

195.    On October 23, 2017, the President of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose plans to further boost sales of OxyContin. These plans were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

196.    Less than two months after the declaration of a public health emergency, McKinsey proposed these "high impact interventions" to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money—"rebates"—to health insurers whenever someone overdosed on Purdue's drug.

197.    McKinsey called these payments for future OxyContin overdoses "event-based contracts"—showing how seriously McKinsey took the opioid epidemic.

198.    These payments had to be "meaningful."  McKinsey suggested a price of between $6,000 and $15,000 for each person who overdoses or develops opioid use disorder (OUD) as a result of Purdue's drugs.

199.    The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused OUD and overdoses in people whose healthcare costs were the insurers' responsibility.

200.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, McKinsey executives were already discussing destroying evidence.

---

[65] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA Network 1 (Jan. 18, 2019), https://jamanetwork.com/jamanetworkopen/fullarticle/2720914.

### 1. Purdue Pleads Guilty Again

201.    On October 20, 2020, Purdue agreed with the United States Department of Justice to plead guilty to improper marketing of OxyContin and other opioids—again. This time, the plea agreement concerned Purdue's conduct between 2010 and 2018. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

202.    In this second plea agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, making illegal payments to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction that has ravaged America for decades."

203.    Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, among other charges, by virtue of its opioid sales and marketing practices after the 2007 guilty plea.

204.    This second plea agreement disclosed that Purdue worked with a "consulting company," though the name of that company was not made public.

205.    The plea agreement directly implicates this "consulting company." It states bluntly: "Purdue, in collaboration with the consulting company, implemented many of the consulting company's recommendations." Purdue also admitted that E2E "was overseen by the consulting company and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ('EOT') and Project Management Office ('PMO')."

### 2. McKinsey Admits Fault

206.    On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued in response to Purdue's second guilty plea. McKinsey wrote:

> As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

207.    On February 4, 2021, McKinsey settled opioid-related claims with 47 states, the District of Columbia, and five U.S. territories for approximately $600 million.

## L.  The Impact of McKinsey's Conduct

208.    The deceptive marketing strategies that McKinsey developed and helped to implement worked, as described above. Deceptive marketing, including marketing McKinsey worked to develop and implement, substantially contributed to an explosion in the use of opioids across the country, including in Sacramento and California.

209.    This was the expected and intended result of McKinsey's efforts.   McKinsey persuaded Purdue to dramatically expand its sales and marketing budget, from just $5 million per quarter to $45 million per quarter. McKinsey also meticulously tracked individual physicians' prescriptions—Purdue's return on investment. It increased sales representatives' quotas for sales calls, required them to focus on high prescribers, and titrated their incentive compensation to get the highest performance.

210.    Studies show that drug company marketing materially impacts doctors' prescribing behavior.[66] The effects of sales calls on prescribers' behavior is well documented in the literature,

---

[66] Puneet Manchanda & Pradeep K. Chintagunta, Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis, 15 (2-3) Mktg. Letters 129-145 (2004) (detailing has a positive impact on prescriptions written); Ian. Larkin, et al. Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children, 33(6) Health Affairs 1014 (2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs).

including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.  The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures.  Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization.  An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

211.    In a 2014 survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic non-cancer pain. [67] McKinsey's misleading and overly aggressive sales tactics are one reason these views persisted even after Purdue's 2007 guilty plea.

212.    As a result of McKinsey's sales and marketing tactics, far more prescribers wrote prescriptions for far more opioids for far more patients.

213.    Independent research demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[68]  The same study further explained: "It seems reasonable to assume that a small percentage of every opioid

---

[67] Catherine S. Hwang, et al., Prescription Drug Abuse: A National Survey of Primary Care Physicians, 175 (2) JAMA Intern. Med. (Dec. 8, 2014).

[68] Theodore J. Cicero et al., Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States, 16.(8) Pharmacoepidemiology and Drug Safety, 827-40 (2007).

drug prescribed is diverted and used non-therapeutically (e.g., to get high).  Thus, when a great deal of drug is prescribed the actual numbers of cases of abuse will rise accordingly."

214.    Other studies have found there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[69]  That same study further explained that "[n]onmedical use of prescription pain relievers in the USA is increasing, and there are comparable rises in hospital admissions for misuse."[70]  It also stated that "[t]he first exposure of most opioid abusers to the opioid began with a legitimate prescription for pain" and that "[a] sharp increase in the prescription of opioids has been associated with increases in opioid overdose."[71]

215.    The CDC has reached similar conclusions about the relationship between the increase in opioid prescriptions and the increase in opioid abuse.  It noted in 2017 that "[p]rescription opioid-related overdose deaths and admissions for treatment of opioid use disorder have increased in parallel with increases in opioids prescribed in the United States, which quadrupled from 1999 to 2010."[72]  The CDC also noted in 2016 that "[s]ales of opioid pain medication have increased in parallel with opioid-related deaths."[73]  The CDC determined that because "[o]pioid pain reliever prescribing . . . has increased in parallel with overdoses involving the most commonly used opioid pain relievers," "[t]o reverse the epidemic of opioid drug overdose

---

[69] Elspeth E. Shipton et al., Deaths from Opioid Overdosing: Implications of Coroners' Inquest Reports 2008-2012 and Annual Rise in Opioid Prescription Rates: A Population-Based Cohort Study, CrossMark, July 12, 2017, at 204, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5693811/pdf/40122_2017_Article_80.pdf.

[70] Id.

[71] Id. at 212.

[72] Vital Signs: Changes in Opioid Prescribing in the United States, 2006-2015, at 1 (July 7, 2017), available at https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6626a4.pdf.

[73] CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016 at 2 (Mar.  18, 2016), available at https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

deaths and prevent opioid-related morbidity, efforts to improve safer prescribing of prescription opioids must be intensified."[74]

216.   As outlined below, the specific impact of McKinsey's deceptive marketing and aggressive sales tactics on the use of prescription opioids is evidenced by, among other things, the massive increase in sales of OxyContin and increase in opioid prescriptions generally and the consequences of massive over-prescription of opioids—including abuse and addiction, overdose, and death—which have been imposed on Sacramento and its residents.

217.   Because an increase in opioid prescriptions has been shown to cause opioid diversion, the expected harms from overmarketing and overprescribing opioids include not only harms in patients that are prescribed opioids but also those who use opioids non-therapeutically. This includes people that first used opioids by prescription and shifted to other drugs as well as people that took advantage of the diversion of legal opioid products to the streets.

### 1.   Sacramento's Increased Spending on Opioid Prescriptions

218.   At the same time that McKinsey's comprehensive (and expensive) promotion of OxyContin increased OxyContin sales, the costs to Sacramento tied directly to prescription opioids also increased. Opioid-related deaths in Sacramento County were recorded 51 times (happening at a rate of 3.2 deaths per 100,000 people) in 2016, and 61 in 2017.  There were also 157 opioid overdose hospitalizations and 207 opioid overdose emergency department visits in 2017 in Sacramento.

219.   Sacramento provides comprehensive health care benefits to its employees and retirees, including prescription drug coverage.  Through these plans, Sacramento has paid millions

---

[74] Rose A. Rudd et al., Increases in Drug and Opioid Overdose Deaths—United States, 2000-2014, at 64 (50 & 51), Ctrs. for Disease Control & Prevention, Morbidity & Mortality Wkly. Rep. 1323-1327 (2016), https://www.cdc. gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

for prescription opioids prescribed to patients covered by the city's health insurance and workers compensation plans.

220.   Healthcare expenses for individuals with opioid use disorders cost employers approximately twice as much on average as expenses for non-abusers.  Sacramento paid to cover the costs of opioids prescribed to City employees and retirees, not including costs paid for workers compensation.

### 2.   Sacramento's Increased Costs Relating to Opioid Abuse, Addiction, and Death

221.   McKinsey's concerted efforts to increase the number of opioid prescriptions at any cost caused a substantial increase in the amount of OxyContin on the market.  Whether a person received opioids from his prescriber or from the illicit market, the harm suffered is a foreseeable consequence of McKinsey's falsely promoting the widespread use of opioids and getting people addicted to an expensive and dangerous product.

222.   In 2014 alone, almost two million Americans abused or were dependent on prescription opioids, resulting in approximately 19,000 deaths involving prescription opioids.  By the following year, the number of deaths had increased to 22,000.  Those statistics do not account for the corresponding steep rise in heroin overdose deaths, which increased 20.6% between 2014 and 2015 and are increasingly common in Sacramento.  The opioid epidemic has a close connection to the increase in heroin use and overdose deaths seen in Sacramento because people who become addicted to opioids often turn to heroin as a cheaper or more accessible opiate alternative.  The effects of the epidemic in Sacramento are wide-reaching and significant.

### a.   Paramedic and Policing Services

223.   The Sacramento Fire Department, Police Department, and Department of Community Response respond to thousands of 911 and 311 calls annually, a large and growing number of which arise from opioid use.  In particular, there have been tens of thousands of such calls (or more) related to homeless encampments and possible overdoses, both of which are due to

increased rates of heroin use.  Each and every medical and police response call imposes additional costs on Sacramento.

224.    Both Sacramento City Fire and Police Department employees are equipped with naloxone and being trained how to administer it.  Recognizing the need to enlist all first responders in the effort to save lives, at least Sacramento Fire and Police Department officials have been trained on the administration of naloxone, resulting in administration of the drug by officers on numerous occasions.

### b.  Serving Seniors in Need

225.    Opioid use disorder can affect people of all ages; racial, ethnic, sexual and gender minorities; income classes; and geographic areas.  Older adults are among the groups affected by this problem because they often use prescription opioids to cope with painful chronic conditions, like arthritis, or procedures, such as surgery.  Indeed, about 40 percent of older adults report pain, compared to 30 percent of the general population.[75] In addition, some older adults have accumulated experiences involving trauma, which can result in anxiety and depression.  Those challenges can make older adults, like people of all ages, prone to relying on opioids and other substances such as alcohol to ease emotional and physical pain in their daily lives.

226.    It is no surprise, then, that older adults were substantially affected by the McKinsey's misconduct.  The Centers for Disease Control and Prevention's (CDC) analysis of data from the National Health and Nutrition Examination Survey, 2007–2012 found that the rate of opioid analgesic use in the past 30 days was 7.9% for those aged 60 and over, compared to 4.7% for those aged 20–39.[76] Data from the National Health and Nutrition Examination Survey (1999 –

---

[75] Le Roux, C., Tang, Y. and Drexler, K., 2016.  Alcohol and opioid use disorder in older adults: neglected and treatable illnesses.  Current Psychiatry Reports, 18(9), p.87.

[76] Frenk, S.M., Porter, K.S. and Paulozzi, L., 2015.  Prescription opioid analgesic use among adults: United States, 1999-2012 (No.  2015).  US Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

2014) show that those aged 65 and older were 25.4 percent of long-term users of opioids.[77]  Overall, Medicare beneficiaries (aged and disabled) have among the highest and fastest-growing rates of diagnosed opioid use disorder at more than 6 of every 1,000 beneficiaries.[78]  And nationally, one-third of Medicare Part D beneficiaries or 14.4 million people had at least one opioid prescription in 2016, with over 500,000 beneficiaries using very high amounts of the medication.[79]  From 1996 through 2010, the number of opioid prescriptions provided to older patients increased 9-fold—the same period where Defendants' scheme to increases opiate use was taking effect.[80]  More alarming, 35% of patients aged older than 50 years with chronic pain reported misuse of their opioid prescriptions in the past 30 days.[81]  Between 2005 and 2014, the rate of opioid-related hospitalizations increased fastest among patients aged 65 years and older compared with all other age groups.[82]

227.    Like anyone else, if older adults use prescription opioids for a long time, they risk developing an opioid use disorder.  But OUD is particularly devastating for the elderly because opioids have a stronger impact on older adults.  Older adults also tend to be using multiple medications, which can interact with opioids and cause serious side effects.  For example, older

---

[77]  Mojtabai, R., 2017.    National trends in long-term use of prescription opioids. *Pharmacoepidemiology and Drug Safety*.

[78] CMS (Centers for Medicare & Medicaid Services).  January 5, 2017.  *Opioid Misuse Strategy*.

[79] DHHS/OIG (Department of Health and Human Services/Office of the Inspector General). 2017. *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing.*

[80] https://www.psychiatrictimes.com/special-reports/opioid-use-elderly

[81] *Id.*

[82] Weiss AJ, Bailey MK, O'Malley L, Barrett ML, Elixhauser A, Steiner CA.  Patient Characteristics of Opioid-Related Inpatient Stays and Emergency Department Visits Nationally and

by State, 2014.  HCUP Statistical Brief #224.  June 2017.  Agency for Healthcare Research and Quality, Rockville, MD.  www.hcup-us.ahrq.gov/reports/statbriefs/sb224-Patient-Characteristics-Opioid-Hospital-Stays-ED-Visits-by-State.pdf.  Accessed July 24, 2018.

adults who use opioids and take an anti-anxiety medication, such as a benzodiazepine, can experience slow respiration to the point of death, depending on dosage levels.  Complicating this situation is that older adults with a substance use disorder, such as an opioid use disorder, may have symptoms similar to those of depression, delirium or dementia.[83] Apart from mixing medications, the ordinary effect of opiates is dramatic: Opioid use among older adults can result in excessive sedation, respiratory depression, and impairment in vision, attention, and coordination, as well as falls.[84] According to the National Safety Council, seniors taking opioids are 87% more likely to die, 68% more likely to be hospitalized, and have four times as many bone fractures compared to seniors taking over-the-counter medications.[85]

228.    Given the risks to older adults and the availability of effective alternatives, prescription opioids are not the first line treatment for chronic pain (Dowell et al., 2016).  The CDC and others have reviewed the available evidence on efficacy of opioid use (Dowell et al., 2016) and found that opioids are moderately effective for pain relief for periods of three months or less, but generally not for long-term use.

229.    Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.  According to a new study, published in the journal *Arthritis & Rheumatology*, chronic opioid use among people with RA doubled between

---

[83] Maree, R.D., Marcum, Z.A., Saghafi, E., Weiner, D.K.  and Karp, J.F., 2016.  A systematic review of opioid and benzodiazepine misuse in older adults.  *The American Journal of Geriatric Psychiatry*, *24*(11), pp.949-963.

[84]  SAMHSA (Substance Abuse and Mental Health Services Administration) and AoA (Administration on Aging). 2012.  *Older Americans Mental Health Issue Brief 5: Prescription Medication Misuse and Abuse Among Older Adults.*

[85]  https://www.nsc.org/in-the-newsroom/opioid-prescription-painkillers-have-hidden-deadly-side-effects https://medshadow.org/medshadow_blog/why-opioids-are-more-dangerous-for-seniors/

2002 and 2015.  People with severe pain and those who also took antidepressants were most apt to become long-term users of these drugs, the study found.[86]

230.     Sacramento's seniors have been particularly affected. Fourteen percent of all Sacramento area residents are seniors.[87] A 2019 analysis from Stanford University shows that people covered by Medicare "have 'among the highest and most rapidly growing prevalence of opioid use disorder.' More than 6 out of every 1,000 Medicare patients are diagnosed with an opioid disorder, compared with 1 of every 1,000 patients covered by commercial insurance plans, according to the report."[88] As of 2007, between 11.5 and 13 percent of all seniors in Sacramento County were enrolled in Medicare, or roughly 28,000 seniors.[89]

231.     The People of California have spent millions of dollars to pay for those excessive and unnecessary opiate prescriptions for California and Sacramento seniors because of McKinsey's misconduct.  Without insurance, someone with an opioid use disorder consuming between 0.5 grams and 1 gram of OxyContin every day for a year would have to spend between $26,280 and $52,560 in 2007—which could be more than the median household income of about $50,000 in 2007 (in 2007 dollars).[90] A person on Medicare would only pay $9.78 per gram, or between $1,785 and $3,570 per year (in 2007 dollars), to fund an opioid addiction in the same year.[91] The difference

---

[86] Lee, et al., *Chronic Opioid Use in Rheumatoid Arthritis: Prevalence and Predictors*, Arthritis & Rheumatology Vol. 71, No. 5, May 2019, pp 670–677.

[87] https://www.census.gov/quickfacts/sacramentocountycalifornia

[88] *Older Addicts Squeezed by Opioid Epidemic*.

[89] https://www.chcf.org/wp-content/uploads/2017/12/PDF-MedicareFactsFigures2010.pdf

[90] White House Council of Economic Advisors, The Role of Opioid Prices in the Evolving Opioid Crisis, April 2019, p. 7.

[91] *Id.*

would be paid by in part by California.  As of 2017, there were 4.5 million Californians enrolled in Medicare.[92]

232.     The People of California were responsible for a substantial portion of those subsidies and increased prescriptions on behalf of Sacramento seniors.  Statewide, 15 percent of Californians were prescribed opioids during 2016. The age range that experienced the greatest opioid prescription rate increase were 70-74 year-olds, whose prescriptions grew from 1,354 per 1,000 people in 2015 to 1,394 per 1,000 people in 2016.[93] According to data released earlier this year by the federal Agency for Health Care Research and Quality, California had the nation's second-highest rate of patients over 65 seeking care at hospital emergency departments for opioid-related issues, such as falls or other accidents caused by the loss of fine motor skills associated with the drugs, or symptoms associated with withdrawal. In 2014, the rate was 110.4 per 100,000 of population. That's second in the nation only to Arizona.[94] But long before that study was released, Califonia seniors were being admitted to hospitals across the state for opiate overdoses. In fact, they were hardest hit by the opiate crisis when measured solely in terms of hospital admissions.



---

[92] https://www.chcf.org/wp-content/uploads/2017/12/PDF-MedicareFactsFigures2010.pdf

[93] https://seniorsymptoms.com/2017/08/11/opioid-overdoses-and-deaths-flooding-u-s-hospitals/

[94]     https://www.calhealthreport.org/2017/08/14/californias-ers-treat-large-number-opioid-cases-involving-seniors/

178 seniors in California age 65 or older died from opioids during 2016. That amount increased to 197 deaths during 2017.[95]

### c. Combating Homelessness

233.    One particularly visible effect of the opioid epidemic that McKinsey exacerbated is the growing homeless population in Sacramento.  Homelessness has become a growing and persistent issue that is directly attributable to the opioid crisis.  As of 2022, 5,038 Sacramento residents were experiencing homelessness—more than double the number of people who were experiencing homelessness across the entire Sacramento County in 2007.  Unfortunately for the City, most of those homeless residents are presently unsheltered.  The City's sheltering capacity did not anticipate the pervasive and destructive impact of the opioid crisis.  In 2016, the Sacramento Police Department were forced to respond to 519 homeless encampments.  In September 2019 alone, the Sacramento Police responded to 3,753 calls for service involving the homeless leading to 3,421 patrol cars being deployed.  The City is in crisis.

234.    Although the causes of homelessness are multi-faceted and complex, the connection between opioid use disorder and homelessness has been studied and established.[96] A survey by the United States Conference of Mayors found that 68 percent of cities reported that substance abuse was the largest cause of homelessness for single adults.  Substance abuse is reported as one of the top three causes of family homelessness by 12 percent of cities.  Adults with a history of substance abuse are very likely to report that they have misused opioids.

235.    Substance abuse is not only a contributing cause of homelessness; individuals who experience homelessness are susceptible to substance abuse as well.  In other words, while some lose their homes because of opioid misuse, others begin misusing opioids after losing their homes.

---

[95] https://pdop.shinyapps.io/ODdash_v1/

[96] *Eg.*, National Alliance to End Homelessness, 2016; Saxon & Malte, 2017; U.S. Conference of Mayors, 2008; McVicar, Moschion, & van Ours, 2015 ("While causation is complex, there is a clear association between homelessness and increasing use of substances as a way of coping.")

About 72% of 296 adults who were currently experiencing homelessness when surveyed in San Francisco reported opioid misuse.[97] About 37% of individuals surveyed reported opioid misuse within the past 90 days.[98] In a Los Angeles study, 50% of youth who were experiencing homelessness reported prescription drug misuse, with 24.5% of youths reporting prescription opioid misuse only and 14.95% reporting misuse of some combination of prescription opioids and other drugs.[99] Of the long-term homeless, 27 percent reported using substances and 46 percent reported receiving substance treatment/rehabilitation services previously.

236.    Worse still, opioid use is killing the homeless.  In Massachusetts, opioid overdose was the leading cause of death among the homeless in 2013.[100] That was the consistent with earlier findings that the homeless are particularly susceptible to overdose deaths.  For example, in a study of 28,033 adults seen at Boston Health Care for the Homeless Program (BHCHP) in 2003–2008, drug overdose caused one in three deaths among those under the age of 45 years, a death rate 16 to 24 times higher than in the Massachusetts general population.[101] Data on deaths among homeless

---

[97] https://aspe.hhs.gov/system/files/pdf/261951/OUDlr.pdf.

[98] *Id.*

[99] *Id.*

[100] Avik Chatterjee, et al., *Exploring opioid use disorder, its impact, and treatment among individuals*

*experiencing homelessness as part of a family*, Drug and Alcohol Dependence 188 (2018) 161–168, at 161

[101] TP Baggett, et al., *Mortality among homeless adults in Boston: shifts in causes of death over a 15-year period,* JAMA Intern Med. 2013 Feb 11; 173(3):189-95.

people in New York City and San Francisco due to substance abuse and overdosing echoed the findings in Boston.[102] Overall, the homeless disproportionately overdose on opiates.[103]

237.    Prescription opioids have not only helped to fuel the homeless crisis, but have also made it far more difficult for Sacramento to address.  Mental health services, for example, are critical for many in the homeless population.  Unfortunately, opioid use and addiction makes it more difficult to provide effective mental health treatment.  Many of those who need help turn to opioids—legal or not—to self-medicate and avoid getting treatment and care that might lead to long-term success and more positive outcomes.  Moreover, treating opiate addiction is very difficult among the homeless, especially where homeless individuals present with simultaneous mental health issues.[104]

238.    As a direct result of McKinsey's conduct described herein, Sacramento has suffered significant and ongoing harms—harms that will continue into the future.  According to one study, to effectively treat a crisis of this magnitude "will require clinical services capable of offering integrated care across these often segregated domains of illness.  This should include coordinated pharmacologic and behavioral approaches to these problems, in addition to sustained surveillance of mortality and cause of death patterns in this population."[105]  In addition, the growing numbers of

---

[102] *See* Gambatese M, Madsen A, Marder D, *Overdose fatality and surveillance as a method for understanding mortality trends in homeless populations*, JAMA Intern Med. 2013 Jul 8; 173(13):1264-5; M. Gambatese, et al., *Programmatic impact of 5 years of mortality surveillance of New York City homeless populations*, Am J Public Health. 2013 Dec; 103 Suppl 2():S193-8.

[103] Lisa M. Pietrusza, et al., *Evaluation of an Opiate Overdose Educational Intervention and Naloxone Prescribing Program in Homeless Adults Who Use Opiates*, Journal of Addictions Nursing 29(3):188-195

[104] Milad Parpouchi, et al., *Characteristics of adherence to methadone maintenance treatment over a 15-year period among homeless adults experiencing mental illness*, **Addictive Behaviors Reports** Volume 6, December 2017, Pages 106-111

[105] Leah K. Bauer, *Characteristics of Homeless Adults Who Died of Drug Overdose: A Retrospective Record Review*, J Health Care Poor Underserved. 2016; 27(2): 846–859.

homeless means that Sacramento must allocate a larger amount of resources to police and medical services, as well as additional resources to clean up needles and human waste in homeless encampments.  In other words, this is a hugely expensive undertaking.

239.    To address the growing homeless population in Sacramento, the city has allocated substantial resources to programs for those suffering from addiction and homelessness, including sheltering programs and home placement services.  These costs have grown substantially in the last decade.  According to Sacramento's estimates, homeless services will cost Sacramento nearly $170 million over the next four years.  As early as next summer, Sacramento could face a $40 million deficit in funding for homeless shelters..

## M. Statutes of Limitations are Inapplicable or Are Tolled

240.    None of Sacramento's claims are barred by a statute of limitations. The causes of action arise from the exercise of a government function. Sacramento seeks to enforce strictly public rights. Sacramento's payment for public and social services in response to the opioid epidemic is for the benefit and common good of all.

### 1.   Equitable Estoppel and Fraudulent Concealment

241.    McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive Sacramento and to purposefully conceal its unlawful conduct and fraudulently assure the public and Sacramento that Purdue was undertaking efforts to comply with its obligations under the state and federal controlled substances laws, all with the goal of protecting its registered manufacturer or distributor status in the State and to continue generating profits for Purdue and McKinsey. Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and Sacramento that they were working to curb the opioid epidemic.

242.    McKinsey was deliberate in taking steps to conceal its conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

243.   McKinsey's consulting services were given confidentiality, and both McKinsey and Purdue concealed the content of those services from the public.

244.   McKinsey and Purdue also concealed from Sacramento the existence of Sacramento's claims by seeking to convince the public that Purdue's legal duties to stop its deceptive marketing and report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and other to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations misled regulators, prescribers and the public, including Sacramento, and deprived Sacramento of actual or implied knowledge of facts sufficient to put Sacramento on notice of potential claims.

245.   Sacramento did not discover the nature, scope, and magnitude of McKinsey's misconduct, and its full impact on Sacramento, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

246.   Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Sacramento deceived the medical community, consumers, and Sacramento.

247.   McKinsey intended that its actions and omissions made with Purdue would be relied upon, including by Sacramento. Sacramento did not know and did not have the means to know the truth, due to McKinsey and Purdue's actions and omissions.

248.   Sacramento reasonably relied on McKinsey's and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 2. McKinsey and Purdue Persisted in the Fraudulent Scheme Despite a Guilty Plea and a Large Fine

249.   In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea,

Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty and agreed to pay $7.5 million in fines.

250.    Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and found seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations. At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million on lobbying and political contributions—eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this Complaint.

251.    As all of the government actions against Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits—and in turn to serve McKinsey's financial interests.

252.    In addition, McKinsey's consulting services were given confidentiality, and the content of those services was not public. Sacramento did not have knowledge of the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020. Information in the public domain was insufficient to place Sacramento on notice of McKinsey's unlawful conduct prior to 2020. For these reasons, any statutes of limitations applicable to Sacramento's claims did not begin to run and were tolled until 2020.

253.   In addition, McKinsey is estopped from relying on any statute of limitations defense because its unlawful practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Sacramento and its community.

## V.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE IN VIOLATION OF CAL. CIV. CODE §§ 3479-80

254.   Sacramento realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

255.   Pursuant to California Civ. Code §3479, anything "which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance."

256.   Pursuant to Cal. Civ. Code § 3480, "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

257.   California Civ. Proc. Code §731 authorizes the "city attorney of any . . . city in which the nuisance exists" to bring a "civil action . . . in the name of the people of the State of California to abate a public nuisance."

258.   McKinsey contributed to, and/or assisted in creating and maintaining a condition that is a significant interference with the public health, the public safety, the public peace, the public comfort, and the public convenience.  McKinsey falsely promoted opioids and engaged in fraudulent schemes in order to encourage the widespread prescription of opioids in ways that were harmful and unsafe.  McKinsey knew of these fraudulent schemes and willingly participated in them and directed them.

259.   The public nuisance created by McKinsey's actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.

260.   This injury to the public includes, but is not limited to (a) widespread dissemination of false and misleading information regarding the risks and benefits of opioids to treat chronic pain; (b) distortion of the medical standard of care for treating chronic pain, resulting in pervasive overprescribing of opioids and the failure to provide more appropriate pain treatment; (c) high rates of opioid abuse, injury, overdose, and death, and their impact on Sacramento families and communities; (d) increased health care costs for individuals, families, employers, and Sacramento; (e) lost employee productivity resulting from the cumulative effects of long-term opioid use, addiction, and death; (f) the creation and maintenance of a secondary, criminal market for opioids; (g) greater demand for emergency services and law enforcement paid for by Sacramento at the ultimate cost of taxpayers; and (h) greater demand and need for social services paid for by Sacramento including for homelessness.

261.   McKinsey knew or should have known that its promotion of opioid use would create a public nuisance.

262.   McKinsey's actions were, at the least, a substantial factor in opioids becoming and remaining widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's marketing scheme, opioid use, misuse, abuse, and addiction would not have become and remained so widespread, and the opioid epidemic that now exists would have been averted or much less severe. As Purdue's management consulting company, McKinsey was in a unique position to observe the flow of opioids and take action when orders were placed for suspicious quantities and suspect intervals, among other things. Instead, McKinsey honed in on these prescribers as cash cows for Purdue. McKinsey's role in marketing opioids and facilitating access to opioid drugs for long-term use contributed to a vast increase in opioid overuse and addiction, as well as an increase in governmental entities' costs, including Sacramento. McKinsey's conduct thus directly caused a public health crisis, including costs for excessive prescribing addition related treatment costs, costs related to deaths, costs related to lost productivity of the workforce, and other costs.

263.    The health and safety of City residents, including those who use, have used, or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to Sacramento and the entire state.

264.    McKinsey's conduct has injuriously affected, and continues to affect, Sacramento property, patrons, employees, and a considerable number of people within Sacramento, and across the state.

265.    McKinsey's conduct also constitutes a nuisance per se because it independently violates other applicable statutes.  As set forth below, McKinsey has violated the California law against false advertising.

266.    Sacramento seeks an order that provides for abatement of the public nuisance McKinsey has created, enjoins McKinsey from creating future common-law nuisances, and awards Sacramento damages in an amount to be determined at trial.

267.    Sacramento also seeks punitive damages because McKinsey acted with actual malice when it deliberately disregarded the risks of their harm-causing actions and engaged in egregious and unjustifiable efforts to achieve greater profits at the expense of the public health and safety.

268.    Sacramento pursues these remedies in its governmental capacity for the benefit of the general public.

## SECOND CAUSE OF ACTION

## COMMON LAW NEGLIGENCE

269.    Sacramento realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

270.    Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains harm proximately caused by the defendant's breach. A presumption of negligence (negligence per se) is established where a defendant's negligence involves the violation of a statute or regulation, where plaintiff is within the class of persons that

the statute or regulation was designed to protect and the violation is a substantial factor in the plaintiff's harm.

271.    McKinsey owed Sacramento duties under statutory and common law, including: (a) the duty to comply with Cal. Bus. & Prof. Code §17500, et seq.'s prohibition on the dissemination of untrue and misleading statements and the California Consumers Legal Remedies Act (CLRA); (b) the duty to promote and market prescription opioids truthfully and without misleading statements and omissions; (c) the duty to disclose the true risk of addiction associated with the use of prescription opioids; and (d) the duty not to deceive, encourage, and facilitate the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and a threat to public health, safety, and welfare.

272.    McKinsey breached these duties by, among other things, for years, devising and assisting Purdue with implementing an aggressive and predatory sales and marketing campaign, including Project Turbocharge, that promoted misleading claims regarding OxyContin to significantly bolster the amount of OxyContin prescribed and distributed throughout Sacramento.

273.    Sacramento was within the protected class of persons that the UCL, the CLRA, and Cal. Bus. & Prof. Code § 17500 were designed to protect.

274.    Sacramento has suffered damages directly, proximately, and foreseeably caused by McKinsey's breaches of its statutory and common law duties.

275.    It was reasonably foreseeable that McKinsey's breaches of its duties would cause harm to Sacramento in the form of higher costs relating to opioid use in Sacramento, as well as opioid abuse, addiction, and opioid-related deaths—costs that would not have been incurred but-for McKinsey's wrongful conduct. Sacramento has suffered monetary costs incurred to abate the effects of the opioid epidemic proximately caused by McKinsey's breaches of these duties.

276.    McKinsey's negligent acts as set forth herein were made with oppression, fraud, or malice.

277.    Sacramento seeks compensatory and punitive damages from McKinsey. Sacramento is entitled to punitive damages because McKinsey acted with actual malice when it

deliberately disregarded the risks that would result from them breaching their duties to promote opioids in a truthful manner and prescribe appropriately.  McKinsey did so while knowing that the risks to the public health and safety, including the risks of addiction, were significant.  McKinsey nonetheless proceeded with its conduct because of the substantial profits it generated.

## THIRD CAUSE OF ACTION

## FALSE ADVERTISING LAW IN VIOLATION OF CAL. BUS. & PROF. CODE § 17500, ET SEQ.

278.    Sacramento and the People reallege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

279.    The False Advertising Law, Cal. Bus. & Prof. Code § 17500, makes it unlawful for any corporation or employee thereof to make or disseminate, or cause to be made or disseminated, any untrue or misleading statement in connection with the sale of any good or service, when it was known or could have been known by the exercise of reasonable care to be untrue or misleading.

280.    As alleged above, McKinsey violated Section 17500 by making and disseminating false or misleading statements about the use of opioids to treat chronic pain, or by causing false or misleading statements about opioids to be made or disseminated to the public.

281.    McKinsey's marketing scheme, also alleged above, was false and deceptive and violate Section 17500. In furtherance of the scheme, McKinsey made misrepresentations and omissions regarding the addictiveness, safety, and efficacy of OxyContin for the purpose of deceiving consumers and prescribers in Sacramento. McKinsey understated the limitations of 12-hour dosing (including end-of-dosage failure), the risks of addiction, and other side effects McKinsey overstated the effectiveness, usefulness, necessity, and safety of opioids by marketing OxyContin for off-label uses (e.g., osteoarthritis) and claiming that opioid use can lead patients to live fuller, active lives, despite knowing that such representations were false. McKinsey also engaged in the predatory targeting of high-prescribing physicians.

282.    McKinsey knew, or by the exercise of reasonable care, should have known that these statements were false, deceptive, or misleading at the time they were made.

283.    As a direct and proximate result of the foregoing acts and practices, McKinsey received income, profits, and other benefits that it would not have received if it had not engaged in violations of the False Advertising Law.   Sacramento and the People seek injunctive relief, restitution and civil penalties as permitted by law for McKinsey's violations of the False Advertising Law.

## FOURTH CAUSE OF ACTION

## COMMON LAW FRAUD AND MISREPRESENTATION

284.    Sacramento realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

285.    Fraud is established where the defendant makes a misrepresentation with knowledge of its falsity and the intent to induce reliance, and the plaintiff justifiably relies on the misrepresentation and suffers damage. Negligent misrepresentation is established where the defendant makes a misrepresentation of a material fact without reasonable ground for believing it to be true and with intent to induce the plaintiff's reliance on the misrepresented fact.

286.    McKinsey, through its business with Purdue, has committed misrepresentation by concealing the following acts and information, among others:

a.    McKinsey's and Purdue's active role in deceptive marketing and oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic;

b.    McKinsey's consulting services and the scope of such services;

c.    The existence of Sacramento's claims seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic.

d.    The high risk of addiction associated with opioid use and propensity of OxyContin's 12-hour dosing to lead to end-of-dose failure and addiction.

e.    There was no basis for making claims as to prescription opioids' safety or efficacy for the treatment of certain indications for which McKinsey and Purdue promoted them; and

f.   There was no basis for McKinsey's and Purdue's representations regarding the risk of addiction and overdose of prescription opioids, which they substantially understated.

287.   McKinsey knew that OxyContin was dangerously addictive and that the false information they provided was material to healthcare provider's decisions to prescribe opioids to patients.

288.   Despite such knowledge, McKinsey created an aggressive marketing campaign and intended that its misrepresentations would be relied upon to encourage additional opioid prescriptions to bolster profits.

289.   McKinsey intended the omission of the concealed facts to deceive Sacramento.

290.   Sacramento was unaware of the concealed facts.  Sacramento, its agents, and the public justifiably relied on the false information McKinsey provided to them both directly and indirectly, as McKinsey intended.  As a result, Sacramento proceeded under the misapprehension that the opioid crisis was a result of conduct by persons other than defendants and was prevented from taking more effective and earlier steps to respond to the opioid crisis.

291.   Had Sacramento known the truth about the concealed facts, Sacramento would have taken other steps to correct the false information and also would not have authorized and paid for certain prescription opioid treatments for its employees.

292.   McKinsey's failure to disclose information about the true level of addictiveness of prescription opioids deceived Sacramento and was a substantial factor in causing Sacramento to pay for prescription opioids for uses that were not medically necessary.

293.   Sacramento was damaged due to its justified reliance on McKinsey's concealments, which were made with oppression, fraud or malice.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

294.   Sacramento realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

295.    California Business and Professions Code Section 17200 prohibits any "unlawful, unfair or fraudulent act or business practice[]."

296.    McKinsey's business practices, set forth in this Complaint, were unlawful, unfair, and fraudulent, and violate Section 17200 because their practices violated state statutes and were likely to deceive consumers in California.

297.    McKinsey understated the limitations of 12-hour dosing (including end-of-dosing failure), the risks of addiction, and other side effects of opioids.

298.    McKinsey overstated the effectiveness, usefulness, necessity, and safety of opioids, including by marketing OxyContin for off-label uses (e.g., osteoarthritis) and asserting that opioid use can lead patients to live fuller, active lives, despite knowing that such representations were false.

299.    McKinsey engaged in the predatory targeting of high-prescribing physicians to fuel the opioid epidemic and marketed OxyContin as an efficient drug that could lead patients to live fuller, more active lives. This conduct likely deceived California physicians who prescribed opioid medications, patients, and payors, who purchased or covered the purchase of opioids for chronic pain and other uses, and municipalities, including Sacramento, who were burdened with the devastating effects of the opioid epidemic.

300.    McKinsey knew or should have known that false and misleading statements about opioids were being made and likely to mislead the public. McKinsey made or disseminated misleading statements or caused false and misleading statements to be made or disseminated.

301.    The misrepresentations alleged herein are fraudulent, and amount to unfair competition as set forth by the Unfair Competition Law, in that McKinsey pioneered a deceptive marketing campaign to understate the addictiveness of opioids and circumvent the Corporate Integrity Agreement.

302.    The misrepresentations and omissions alleged herein are unlawful, and thus amount to unfair competition as set forth by the Unfair Competition Law, in that they violate, among other things, California Civil Code §§ 3479 and 3480, California Business and Professions Code § 17500,

and several other common law violations, including negligence, fraud and misrepresentation, and public nuisance. As set forth above, McKinsey misrepresented the dangers of OxyContin. McKinsey disseminated these untrue and misleading representations with the intent to boost sales and profits for itself and Purdue.

303.     The misrepresentations and omissions alleged herein are unfair, and thus amount to unfair competition as set forth by the Unfair Competition Law, in that they are immoral, oppressive, unscrupulous, and substantially injurious to consumers and Sacramento's community. The injury to Sacramento and its community caused by the opioid epidemic, fueled by McKinsey's actions, greatly outweighs any benefit to consumers or competition under all of the circumstances.

304.     As a direct and proximate cause of McKinsey's violations of the Unfair Competition Law, Sacramento suffered an injury and monetary harm, in the form of, among other things, money expended to respond to and abate the opioid epidemic.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court enter judgment against Defendants:

> (a)     awarding judgment in its favor and against McKinsey on each cause of action asserted in the Complaint;

> (b)     assessing compensatory and punitive damages against McKinsey;

> (c)     assessing the maximum statutory civil penalties for each violation of the California's False Advertising Law;

> (d)     permanently enjoining McKinsey from making further false or misleading statements or otherwise engaging in deceptive practices as described in the Complaint;

> (e)     requiring McKinsey to abate the public nuisance their conduct has created;

> (f)     ordering McKinsey to pay costs, losses, and damages for the injuries sustained by Sacramento, acting on its own behalf and on behalf of its inhabitants, as a proximate result of McKinsey's unlawful conduct as described in the Complaint, including restitution, civil penalties, disgorgement of unjust enrichment, punitive damages, and attorneys' fees and costs; and

(g)   awarding other such relief as the Court deems proper.

Respectfully Submitted,

Steven Sklaver (SBN 237612)
Michael Gervais (SBN 330731)
Rohit Nath (SBN 316062)
Susman Godfrey L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com
rnath@susmangodfrey.com

Seth Ard (*pro hac vice* to be filed)
Ryan Sila (*pro hac vice* to be filed)
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340
sard@susmangodfrey.com
rsila@susmangodfrey.com

Joel Liberson (SBN 164857)
Trial & Appellate Resources, P.C.
3665 Torrance Blvd., 3rd Floor
Tel: (917) 848-3218
joel@taresources.com

Robert S. Peck (*pro hac vice* to be filed)
Center for Constitutional Litigation, P.C.
1901 Connecticut Avenue, NW, Suite 1008
Washington, DC 20009
Tel: (202) 944-2874
Fax: (646) 365-3382
robert.peck@cclfirm.com

Susana Alcala Wood (SBN 156366)
City Attorney
Matthew D. Ruyak (SBN 184772)
City of Sacramento
915 I Street, 4th Floor
Sacramento, CA 95814-2608
Tel: (916) 808-5346

74
COMPLAINT

sawood@cityofsacramento.org
mruyak@cityofsacramento.org

*Attorneys for Plaintiffs*